## AUSTIN *v.* SOUTHERN HOME BUILDING AND LOAN ASSOCIATION, for use, etc.

1. Adverse possession of land is notice of whatever facts in reference to the title would be developed by inquiry of the person in possession, the presumption being that inquiry of him will disclose how and under what right he holds possession, and therefore lead to the discovery of the real adverse holder, whether himself or another for or under whom he holds possession; and in the absence of such inquiry, the presumption is that had it been made, the right, title, or interest under which the possessor held would have been discovered.

2. The effect of possession is to put a prospective purchaser upon inquiry; and if it can be shown that he made such inquiry and followed it up in good faith, and was informed that the title was in another, from whom he purchased, the presumption arising from possession will be overcome.

3. Where husband and wife are in possession of land, the presumption is that the possession is that of the husband.     The effect of this presumption is to charge a prospective purchaser with the duty of inquiring of the husband as to the state of the title, and upon failure to make such inquiry he is bound by whatever facts an inquiry would have developed.

4. Where husband and wife are in possession of land, and the record title is in the husband, who makes application for a loan upon the property, asserting by his application title to and ownership in the property, the lender is protected against a secret equity of the wife ; the conduct of the husband in applying for the loan indicating that a direct inquiry of him as to the true state of the title would be met with the response that he was the owner.

5. A deed to land, executed before and attested by a notary public in the county where he holds his appointment, may thereupon be recorded in another county where the land lies.

6. One who is an agent and attorney at law of a lender of money, who represents such lender in negotiations for a particular loan, and who is also a notary public, may, in the latter capacity, lawfully attest a security deed given to secure the loan negotiated by him.

7. When a claimant in a statutory claim case files a petition in aid of his claim, praying equitable relief, and such petition is answered, the statutory proceeding is converted into an equity case, so that when the same is referred to an auditor exceptions of fact to his report need not be submitted to a jury unless the judge approves them, and whether they shall be approved is a matter addressed to the sound discretion of the judge.     In the present case it has not been made to appear, with that certainty which the law requires, that the judge abused this discretion.

8. When an execution is levied and a claim interposed, and the claimant in aid of his claim files an equitable petition, praying that in the event the property is found subject the amount due on the execution be ascertained, offering to pay that amount, and the answer to the equitable petition is purely defensive, a decree fixing an amount due by the defendant in execution, larger than the total amount due on the execution, and charging the land with its payment, is unauthorized by the pleadings.

9. "The general doctrine is, that the debtor has a right, if he pleases, to make the appropriation of payments; if he omit it, the creditor may make it; if both omit it, the law will apply the payment according to its own notions of justice.     It is certainly too late for either party to claim the right to make an appropriation, after the controversy has arisen, and a fortiori at the time of the trial."

10. Directions given as to the entering of a final decree.

Argued February 13, — Decided March 24, 1905.

Exceptions to auditor's report.     Before Judge Roan.     DeKalb superior court.     September 18, 1903.

An execution for $1,207.56 principal, and $60 interest to August 14, 1897, in favor of the Southern Home Building and Loan Association, for the use of the Equitable Loan and Security Company, against Henry C. Austin, and especially against a described

tract of land, was levied upon the land therein described, and a claim was interposed by his wife.    In aid of her claim she filed an equitable petition, alleging facts which she contended entitled her to assert an equitable title to the property against the plaintiff in execution.    The prayers of the petition were, that judgment be entered finding the property not subject to the execution; that in the event this prayer was refused, the amount due the plaintiff on the execution be ascertained; and that in the event the property was found subject, she be permitted to pay the amount due, which she tendered and offered to pay.    The plaintiff in execution filed an answer to this petition, in which the allegations relied on to establish the claimant's equitable title were denied.    Henry C. Austin was made a party to the case, which came on for trial, and the judge, of his own motion referred it to an auditor.    The auditor filed a report, and the claimant filed numerous exceptions of law and fact, one of the exceptions being that the findings had not been properly classified and arranged in the report.    This exception was sustained, and the auditor was directed to file his report in accordance with the statute in reference to the classification of findings.    In compliance with this order, the auditor filed a second or supplemental report.    This report classified the findings of law and of fact, the findings being in substance the same as those in the original report.    The claimant filed exceptions to the supplemental report, and also urged the exceptions which had been filed to the original report.    The case came on to be heard before the judge on the exceptions filed, and he refused to approve any of the exceptions of fact, sustained some of the exceptions of law, overruled others, and entered a decree on the auditor's report as modified by his ruling on the exceptions of law.    The claimant excepted to the refusal of the judge to approve her exceptions of fact, to the overruling of some of her exceptions of law, to the refusal to submit the exceptions of fact to a jury, and to the decree as rendered.    The facts as found by the auditor were in substance as follows: Austin bought the property in controversy and took a bond for titles in his own name, making a payment in cash, and giving his notes for the balance of the purchase-money, in compliance with the bond for titles.    The obligors therein executed a deed to Austin and deposited it with a bank, to be delivered when the purchase-money notes were paid.

Austin delivered the bond for titles to his wife, who had furnished the money to pay for the property, but made no written transfer to her at that time. Mrs. Austin, in addition to paying the purchase-money for the lot, expended about $3,500 of her own money in making improvements on the property, while the bond for titles was actually in her possession, but before it had been transferred to her. Prior to the time that her husband incurred the indebtedness to the plaintiff she had been in possession of the property by her tenant, and at the time the plaintiff loaned the money to her husband and took a deed from him to secure its payment the property was in the possession of Alonzo Field, who was not a tenant of Mrs. Austin, but was in possession under a contract of purchase from her as the owner. The plaintiff had no actual knowledge of the fact that Mrs. Austin had furnished the money to pay for the lot, or that the improvements thereon had been paid for with her money, or that she claimed the same as her property. At the time the money was loaned to Austin the record title to the property was in him. Subsequently to the execution of the security deed, Field, having failed to comply with his contract of purchase, surrendered possession to Mrs. Austin, and she rented the property to different parties from time to time. Austin transferred the bond for titles to his wife about the time that Field made his contract of purchase, but the transfer had not been recorded at the time the plaintiff's claim originated.

While Field was in possession, Austin applied to the plaintiff for a loan of $1,000, claiming the property as his own, and presenting an abstract of title. The security deed was dated August 14, 1894. On April 29, 1895, Field still being in possession, the plaintiff made an additional loan of $400 to Austin, and took a second security deed to the property. On November 14, 1895, the plaintiff made another loan of $2,000 to Austin, which was secured by a deed to another tract of land, in which Mrs. Austin claimed no interest. This tract of land was subsequently sold by the sheriff under an execution in favor of the plaintiff, and bought by the Equitable Loan and Security Company, at the price of $1,525, but under an agreement with the defendant in execution that he was to have credit for this property at the sum of $2,750. A finding of fact which appears in the supplemental report, and which did not appear in the original report,.

was that while Mrs. Austin had furnished her husband money
enough to pay for the property in controversy, with direction so
to apply it, he had in fact used a part of the money borrowed
from the plaintiff in making the final payment of the purchase-
money, though this fact was not known to Mrs. Austin at that
time.    The $1,000 and the $400 were borrowed on the building
and loan plan.    After having paid dues, etc., for a "good while,"
suit was brought by the plaintiff for a larger sum than Austin
thought he owed the association.    He filed a defense to this suit,
and then negotiated with the Equitable Loan and Security Com-
pany for a loan to settle the plaintiff's claim, and also to obtain
additional money which he desired to use in a business that he
was carrying on.    At that time he was already indebted to the
Equitable Loan and Security Company as indorser on notes of
which one Mitchell was the maker, which had been transferred
to it.    This indebtedness was unsecured.    In order to obtain
security for this indebtedness, and to make what was considered
a satisfactory loan, the Equitable Company bought up the claims
of the plaintiff against Austin for $2,500, advanced to him the
further sum of $630.25, and made an agreement with him, under
date of June 8, 1899, for the suits in favor of the plaintiff to pro-
ceed for the use of that company for the full amount sued for,
Austin agreeing to withdraw all defense.    At the time this agree-
ment was made Austin and his wife were living together on the
property in controversy, but the Equitable Company had no in-
formation or actual notice that Mrs. Austin claimed the property
as her separate estate.    The suits proceeded to judgment, and one
of the executions was levied on the land in which Mrs. Austin
had no interest, and upon which the third loan of $2,000 had been
made by the plaintiff, and which was purchased by the Equitable
Company under the circumstances referred to.    The total in-
debtedness of Austin to the Equitable Company was, on June
8, 1899, fixed at $4,000 principal.    The agreement provided that
Austin was to pay $40 per month as rent, but the auditor finds
that this was a cloak to cover usury, and was therefore illegal.
As a final conclusion, the auditor found that the property was
subject to the execution; that on August 7, 1900, the date of the
sheriff's sale above referred to, the balance due by Austin to the
Equitable Company was $1,659.01; and that the plaintiff was

entitled to eight per cent. interest on this sum from that date. The auditor further found that the plaintiff was entitled to $125.97 for taxes and insurance.    The judge held that the auditor erred in allowing interest at eight per cent. on the sum which he found to be due, that on a portion of the $4,000 indebtedness the plaintiff was entitled to only six per cent. interest, on the remainder to seven per cent., and that the final amount should bear only seven per cent. interest, and also reduced the finding for taxes and insurance to $69.27.    The decree was that Austin was indebted to the plaintiff $1,578.98, with interest from August 7, 1900, on $949.58 at six per cent. per annum, on $629.40 at seven per cent. per annum, and the further sum of $69.27 for taxes and insurance; these sums to be a charge upon the land in controversy.    It was provided that if Mrs. Austin would pay these amounts to the plaintiff for the use of the Equitable Company, within sixty days from the date of the decree, the property should be relieved of all claims of the plaintiff against it; and in the event Mrs. Austin failed to pay these sums within the time specified, it was decreed that the execution proceed and the property be sold as provided by law.    The case is here on a bill of exceptions sued out by Mrs. Austin.

*J. D. Kilpatrick*, for plaintiff in error.
*Candler & Thomson* and *W. D. Thomson*, contra.

COBB, J.  1. Possession of land is notice to the world of every right that the possessor has therein, legal or equitable.  Possession of land being an incident, and a very important incident, of ownership, the law raises a presumption that he who is in possession is the owner, and actual and notorious possession of land is sufficient to put a prudent person on inquiry as to the rights of such possessor before such land is purchased from one not in possession, or otherwise made the subject of negotiation or contract with him. Possession is not only notice of the rights of the possessor, but also of all facts that would be developed if inquiry were made of the one in possession and a truthful response were made.    Therefore possession is notice of the rights of those under whom the possessor claims.    This subject has been so thoroughly and exhaustively dealt with by Mr. Justice Fish in the case of *Walker* v. *Neil*, 117 *Ga.* 745 (10), that we do not deem it necessary to do

more than call attention to the conclusion there reached and the absolutely sound reasoning set forth to support it. Applying these principles to this case, at the time the plaintiff made the loans of $1,000 and $400 to Austin, Field was in possession of the property under a contract of purchase from Mrs. Austin as the owner. If inquiry had been made of Field and a truthful response had been made, the plaintiff would have been informed that although the record title to the property was in Austin, Mrs. Austin was in equity and in truth the real owner of the property and was dealing with it as her own. No inquiry was made. The plaintiff was voluntarily ignorant, and therefore it was charged with notice of the fact that Field held under Mrs. Austin and of every fact which inquiry of Field and Mrs. Austin would have developed. Wade on Notice (2d ed.), § 279.

2-4. The plaintiff, the Southern Home Building and Loan Association, being charged, at the time of the loan of the money to Austin, with notice of Mrs. Austin's equitable title, is in no position to assert any of the rights which would be accorded to a bona fide purchaser without notice, and therefore, as against it, Mrs. Austin has a right to assert her equitable ownership of the property. Can she assert this against the plaintiff's usee, the Equitable Loan and Security Company? The Equitable Company was a purchaser, for value, of the debts due by Austin to the plaintiff, and of such an interest in the land covered by the security-deed as was necessary to enforce the payment of the debt. At the time it paid out its money to purchase the claims against Austin, it had no actual notice of Mrs. Austin's equitable ownership. Whether she can assert her equitable ownership against it depends upon whether her possession with her husband was sufficient to put the Equitable Company upon notice of her title, notwithstanding the record title in her husband and the fact that in the negotiations between it and him he was asserting ownership to the property. When husband and wife are in joint possession of land, there is a presumption that the possession is that of the husband. Civil Code, § 3931. One desiring to purchase land or acquire any interest therein is therefore pointed by this presumption to the husband as the person to whom inquiry should be made as to the actual state of the title; and if no inquiry is made, or nothing which is in effect an inquiry, the per-

son attempting to acquire an interest in the land is charged with notice of whatever facts would be developed by inquiry and truthful response by the husband. If, therefore, the Equitable Company had bought the claims against Austin without doing anything which would amount to an inquiry of him,—had been voluntarily ignorant notwithstanding the husband and wife were both in possession and the law pointed to the husband as the one to whom inquiry should be addressed, then it would have proceeded at its peril; and if it subsequently developed that the husband was really not the owner but the wife was, its rights would have been subordinated to those of the wife. See *Walker* v. *Neil,* 117 *Ga.* 747.

But the Equitable Company was not in this position. While it did not in terms address the inquiry to Austin, " Are you the owner of this property ?" it did what was equivalent thereto, and received what was in effect a response that he was the owner. He came to it and represented that the record title was in him. He in effect asserted by his application for a loan that he was the owner, and under such circumstances it was not necessary, in order to make complete the inquiry which the law required, that there should be a direct interrogatory addressed to him, " Are you in reality the owner of this property ?" His conduct was such as to indicate that specific inquiry would have brought no other response than that given in effect by his application for a loan, based upon assertions by him that he was the true owner of the property. Possession of land is not conclusive upon the purchaser as to the rights of the possessor or those under whom he claims. The effect of it is to put him upon inquiry, and when it is shown that prior to the purchase from the holder of the record title he followed up the inquiry in good faith, and received no information which would impeach the apparent rights of the holder of the record title, the presumption arising from possession by another will be overcome. Wade on Notice, (2d ed.) § 274. Possession charges a prospective purchaser with the duty of making inquiry. When he fulfils this duty, and inquiry when made and followed up in good faith results in nothing that would be an obstacle to a purchase by him, he has complied with his obligations to the law and to the owner of the property, and is entitled to claim whatever rights accrue to one who purchases

without notice after due inquiry of those from whom the law directs him to seek information. In *Neal* v. *Perkerson*, 61 *Ga.* 346 (4), there is a headnote which asserts that " joint residence of husband and wife on realty does not give notice of any claim of interest in it by the wife." This headnote was made by the reporter, and, as was shown by Mr. Justice Fish in *Walker* v. *Neil*, supra, was broader than the facts of the case authorized;. the ruling in that case being merely that where husband and wife are in possession, presumptively it is his possession. There is nothing in that decision in conflict with the proposition that, notwithstanding this presumption, the duty of a prospective purchaser is to go to the husband as the source of information in reference to the true title, or he proceeds at his peril, if the wife is really the owner. In that case the husband borrowed money upon the wife's land, and it was held that the lender was protected against the secret equity of the wife. There was no other inquiry or response in reference to the title than would be involved in the application of the husband for the loan and the making of the loan on such application. In principle, the case is controlling here. The case of *Clarke* v. *Beck*, 72 *Ga.* 127, so far as it apparently lays down the rule that where the law requires inquiry, and inquiry is made, and results in false information upon the faith of which one acts, the party acting upon the false information is bound by the exact truth, notwithstanding his diligent efforts and failure to obtain the same, is in conflict in principle with the decision in *Neal* v. *Perkerson*; and if controlling at all as a precedent, it should be restricted in its application to cases arising upon exactly similar facts.

5. The land in dispute was wholly in the county of DeKalb. Some of the deeds relied upon by the plaintiff in execution were executed in other counties and attested by notaries public of such counties. Objection was made to the introduction in evidence of these deeds, on the ground that they had not been properly executed and therefore were improperly admitted to record, the contention being that a notary public could not attest a deed conveying land situated out of the county in which he held his appointment. The question thus raised is settled, adversely to the contention of the plaintiff in error, by the decision in *Anderson* v. *Leverette*, 116 *Ga.* 732.

6. One of the security deeds and some other papers which were offered in evidence were attested by a notary public who was an agent of the lender, and was at the time representing the corporation in the matter of negotiating the loan.    Objection was made to the admission of these papers, on the ground that such attestation was illegal.    Under the ruling in *Jones* v. *Howard,* 99 *Ga.* 451 (3, 4), such attestation was valid.    We were requested to review and overrule that decision on this point, but must decline to do so. '

7. The claimant contended that, as a matter of right, her exceptions of fact to the auditor's report should have been submitted to a jury.    The claimant, by her petition for equitable relief in aid of her claim, converted the proceeding into one in equity, and she can not complain that her rights are administered according to the customs and practice of that forum into which she has voluntarily carried her case.    *Mackenzie* v. *Flannery,* 90 *Ga.* 590 (1).    It is now settled that in an equity case where there is evidence to sustain the findings of the auditor, and the judge is satisfied therewith, he need not submit the exceptions of fact to a jury.    *Bemis* v. *Armour Packing Co.,* 105 *Ga.* 293; *Lamar* v. *Allen,* 108 *Ga.* 158 (5); *Weed* v. *R. Co.,* 119 *Ga.* 576 (7).    By the filing of the equitable petition of Mrs. Austin the statutory claim case was converted into an equitable proceeding.    The judge had authority to refer it to an auditor on his own motion.    He was required to submit the exceptions of fact to a jury only in the event he approved them; and it has not been made to appear, with that certainty which the law requires, that he abused his discretion in refusing to approve these exceptions.    See *Fowler* v. *Davis,* 120 *Ga.* 442.

8. The finding of the auditor as to the amount due by Austin to the plaintiff shows a principal sum not only greater than the principal in the execution, but greater than the principal and interest on the execution; and although the judge eliminated different items, the decree as finally rendered is for a principal amount in excess of the principal and interest due on the execution. While it is not at all clear from the decree that the judge intended that the execution should in any event be enforced for a larger sum than the principal and interest on the execution, the decree is subject to this interpretation.    It provides that the

amount stated therein shall be a charge upon the land, which may be relieved by its payment, within sixty days; and upon failure to pay, that the execution proceed. The prayer of the petition was that the amount due on this execution be ascertained, and this amount the claimant offered to pay. The answer was purely defensive. There was no prayer for cross-relief. The decree therefore is broader than the pleadings. The amount due on the execution levied should have been ascertained, and the claimant given an opportunity to pay this amount and discharge the execution, leaving the plaintiff at liberty to enforce other demands which it might have against the land, in an appropriate proceeding. A general accounting and a decree winding up the whole matter might have been had under appropriate pleadings. An accounting was necessary, but it was to be had for a single purpose, and that was to ascertain the amount due on the execution which had been levied, in order that the claimant might, if she saw proper, discharge the land from the lien of this execution, leaving it subject to whatever other lawful claims the plaintiff might have against it.

9. When a creditor has several claims against his debtor, and the latter makes a payment, with no direction as to its application, the general rule is that the creditor may apply such payment to any claim which he holds against the debtor. *Green* v. *Ford*, 79 *Ga.* 130. If, however, such payment is not actually applied to any of the demands until litigation is begun, the creditor's right to apply the payment as he may see proper is gone, and the court will make such application as may be consistent with equity and justice. In United States *v.* Kirkpatrick, 9 Wheat. 720, Mr. Justice Story said: "It is certainly too late for either party to claim the right to make the appropriation after the controversy has arisen, and, a fortiori, at the time of the trial." The language of Mr. Justice Story was quoted with approval in Callahan *v.* Boazman, 21 Ala. 246, and the ruling in the latter case was approved in *Gunn* v. *Carter*, 69 *Ga.* 649.

10. The conclusion reached by the auditor that the property levied on was subject to the execution was correct. It remains now to ascertain what was the amount due on the execution at the time it was levied. On June 8, 1899, the Equitable Company held against Austin the three obligations which it had bought

from the building and loan association, upon which two suits were then pending, a claim of $869.75, represented by Austin's indorsements on the Mitchell notes, and an additional loan of $630.25. By the agreement entered into between Austin and the Equitable Company on that date, the total amount of Austin's indebtedness was fixed at $4,000; and it is clear from the agreement that it was the intention of the parties that whenever this sum was paid, Austin was to be relieved of every liability to the Equitable Company on account of any claims that it then held against him, and it is equally clear that it was the intention of the parties that any judgment that might be rendered in the two suits pending, which the agreement expressly authorized to be taken, should be treated, as between the parties, as a means of securing the payment of the $4,000; the right being reserved to enforce such judgments for the full amount, as well as any other security which the company might have after the lapse of two years. So far as the rights of third parties were concerned, the Equitable Company had no right to make these judgments liens for anything more than the amount actually due thereon, but it was, even as against the rights of third parties, competent for them to provide that payments made by Austin thereafter should be appropriated first to unsecured claims. And if this agreement was entered into in good faith, with no intent to defraud Mrs. Austin, or any one else having an interest in the property which would be subject to the liens of the judgments, such third persons would have no right to object when Austin used money derived from other property owned by him to pay the unsecured advances made to him at the time the claims of the building and loan association were purchased. He had no right, as against such persons, to make the loan deeds security for anything more than the money advanced at the time they were made, but he did have a right to use his money to pay other debts, leaving the debts secured by the loan deeds still unpaid. The agreement did not in terms specify that the $4,000 should bear interest, but it was stipulated that Austin should pay rent at the rate of $40 per month for the property embraced in the security deed. The auditor has found that this part of the contract was simply a scheme to evade the usury laws and obtain 12 per cent. interest; and this is manifestly correct. The judge held that the Equitable

Company was entitled to charge only 6 per cent. interest upon the principal of the judgments which were thereafter rendered under the terms of the agreement.  There is no exception to this ruling, and that rate only will be allowed in determining the amount due on the executions.  In accordance with the agreement, judgment was taken in one case for $1,889.90 principal, and in the other case for $1,207.56 principal, that being the judgment upon which the execution levied was issued.  Subsequently to June 8, 1899, it was agreed between Austin and the Equitable Company that the property embraced in the security deed and in which Mrs. Austin had no interest should be purchased for $2,750, and Austin should be allowed credit for this sum.  There was no direction by him as to how this credit should be applied, nor had the Equitable Company actually applied it in any given way before this litigation began.  This credit should therefore be applied according to the intention of Austin and the Equitable Company as drawn from the agreement of June 8, 1899, and the circumstances under which that agreement was entered into, paying due regard to the rights of Mrs. Austin as the equitable owner of the property levied on.  See *Pritchard* v. *Comer*, 71 *Ga.* 18 ; *Holley* v. *Hardeman*, 76 *Ga.* 328.

On June 8, 1899, the amount due by Austin to the Equitable Company on the various claims held by it against him was in excess of $4,000.  The Equitable Company purchased the claims of the building and loan association, represented by the execution levied, and also advanced $630.25 upon the faith of Austin's apparent ownership of the property.  It does not appear that the Mitchell notes with Austin's indorsement were purchased on the faith of this property, and the Lanford execution was not owned by the Equitable Company, as shown by the record, on June 8, 1899.  The three claims which the Equitable Company purchased from the building and loan association, and the $630.25 additional advance made to Austin on June 8, 1899, principal, interest, and costs, aggregate about $3,900.  At that time, on account of the circumstances under which the claims were purchased and the additional advance made, the Equitable Company was in a position where it could say to Mrs. Austin, " You have permitted your husband to take title to this property of yours in his own name. It is true that you were both in possession; but the law charged

me with the duty of inquiring of your husband as to the true state of the title. I have made due inquiry, and he has come to me and stated in effect that he is the owner and you are not; and therefore, as between us, my equity is superior to yours, and the law will authorize me to treat the property as his and not yours." This would be true as to the debt represented by the security deed embracing the property levied on, and also with reference to the additional advance; but would not be true as to the amount represented by the other security deed. When the Equitable Company and Austin agreed that the property in which his wife had no interest should be taken by that company at a fixed valuation of $2,750, and Austin be given credit for that amount, we think it would be not only in accord with the intention of Austin and the Equitable Company, as manifested by the transactions between them, but it would also be paying due regard to Mrs. Austin's rights as equitable owner of the other property, which she is entitled to have respected, that this amount should be appropriated first to the complete discharge of the judgment which had a special lien upon that property. This appropriation should be made as of August 7, 1900, the date of the sheriff's sale. The amount due on the judgment of that date, principal, interest, and the costs of obtaining the judgment, calculating interest at six per cent. on the principal, is $2,031.78. We do not think that Austin should be charged with the expenses of the sale, as it is manifest from the agreement between him and the Equitable Company that he was to be entitled to a net credit of $2,750, and that the sheriff's sale was made merely to confirm the title of the Equitable Company, and, so far as the record discloses, was not absolutely essential for that purpose. After the payment of this judgment there would remain, of the $2,750, $718.22. There being nothing in the record to indicate that the contract of June 8, 1899, was made for the purpose or with the intention of defrauding Mrs. Austin (in fact at that time the Equitable Company did not know that Mrs. Austin had an interest in any of the property), it is permissible to apply the payment according to the intention of Austin and the company. It is clear that the company desired to hold its secured claims, to be used for the purpose of making it whole, and it was legal for it to do so, and therefore the payments made should be appropriated first to the unsecured claim. While it

would not be entitled to have the payments to be made applied to those unsecured claims which were not connected in any way with the property that it held, it would be entitled to apply them to the unsecured claim represented by the advance made upon the faith of Austin's apparent ownership, and therefore the additional advance should be next paid. On August 7, 1900, there was due on this advance, calculating interest at seven per cent., $681.72, and after appropriating a sufficient amount to pay this sum, there remains of the $2,750, $37.50. On August 7, 1900, there was due on the execution levied $1,207.56 principal; and six per cent. interest on this sum from June 8, 1899, amounts to $84.52. Applying the balance of the payment to the interest, the amount remaining due on the execution levied, on August 7, 1900, would be $1,207.56 principal, $47.02 interest, and $8.75 costs; and the principal of this execution would bear interest from the date last named at the rate of six per cent. per annum. We do not think the Equitable Company is entitled to enforce the execution levied for any other sums than the amount due on it, which we find to be the sum above stated.

The Lanford execution can not be enforced, either by itself or under cover of the execution levied, against the property claimed by Mrs. Austin. It appears from the record that the Lanford execution was not transferred to the Equitable Company until April 10, 1900, long after the agreement between Austin and the Equitable Company in reference to the amount of his indebtedness, and nothing appears to indicate that the money used to purchase this execution was advanced at the instance of Austin or in any other way upon the faith of the property in dispute. We do not think that Mrs. Austin is chargeable with the amount paid out for insurance, as it does not appear from the record that either in the security deed or by agreement it was provided that insurance premiums paid out should be secured by that instrument. The property is liable for so much of the tax executions transferred to the Equitable Company as represent the taxes upon that property, and, as we understand from the decree, the judge has found this sum to be $42.27. These executions are themselves, to this extent, liens upon the property, and would be liens independently of any arrangement between Austin and the Equitable Company.

This litigation should end. The Equitable Company is entitled

to collect the amounts due to it which the law charges upon this property, and Mrs. Austin is entitled to discharge her property from these claims by an early payment, if she so desires, or, if she permits the property to be sold, she is entitled to the surplus after the payment of such claims of the Equitable Company as are lawful charges upon the property.    We are therefore of opinion that we should exercise the power which the law gives us to make a final decision in the case, by giving such directions as to the decree as will bring about a speedy termination of this too long-protracted litigation.    The judge should enter a decree declaring that the amount due on the execution levied was, on August 7, 1900, $1,207.56 principal, $47.02 interest, and $8.75 costs, and six per cent. interest from that date on the principal sum until paid; and that these sums are a charge upon the land levied on, and also that the tax executions to the amount of $42.27, besides interest and costs thereon, are charges and liens upon the land.    It should be provided that if Mrs. Austin, within thirty days from the date that the decree is entered, shall pay to the sheriff the amounts above referred to, and also the costs of the present case, exclusive of the costs incurred in bringing the case to this court, and including one half of the expenses of the auditor's fee and the hearing before the auditor, if the same has not already been paid, she shall be entitled to have the execution levied and the tax executions above referred to marked satisfied and declared to be no longer liens upon the land in dispute; and that if she should fail to do this within the time specified, then the execution levied shall proceed, and from the proceeds of the sale the costs of the levy and sale and the costs of this case above referred to be first paid, the remainder of the proceeds be applied to the payment of the execution levied and the tax executions, any surplus remaining to be paid over to Mrs. Austin or her attorney of record.    The costs of this writ of error and all the costs of bringing the case to this court are to be taxed in the court below against the defendant in error.

*Judgment affirmed, with directions.    All the Justices concur.*